IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 25, 2001 Session

## IN THE MATTER OF D.I.S., D.O.B. 10/8/1987

**An Appeal from the Juvenile Court for Shelby County**
**No. B3427     George E. Blancett, Special Judge**

————————

**No. W2000-00061-COA-R3-CV - Filed May 17, 2001**

————————

This case involves the termination of parental rights. The juvenile court, *sua sponte*, dismissed the petition to terminate the parental rights of the mother at the end of the petitioner's proof. The petitioner appeals. We affirm, finding that there is sufficient evidence to support the trial court's finding that termination of the mother's parental rights would not be in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Nanette L. Wesley, Georgia A. Robinette, Memphis, Tennessee, for the appellant, Court Appointed Special Advocate.

Debra N. Brittenum, Webb A. Brewer, Nancy P. Kessler, Memphis, Tennessee, for the appellee, Brenda Smith.

### OPINION

This case involves the termination of parental rights. The child involved, D.I.S. ("D.I."), born October 8, 1987, is the daughter of Brenda Guy Smith ("Mother").

The first petition to remove D.I. from Mother's custody was filed on April 11, 1991, by Inez Denson, a non-relative. The petition sought to remove D.I., as well as her two older sisters, Tameka Nicole Myles ("Tameka"), born April 19, 1980, and Nekeisha Mignon Anderson ("Nekeisha"), born December 4, 1976. The first petition resulted in Nekeisha being removed to the custody of Ms. Denson while Tameka and D.I. remained in Mother's custody. On June 11, 1992, a second petition to remove D.I. from Mother's custody was filed. This petition was filed by Sandy Knowlton. Knowlton was listed as a non-relative, but was later identified as D.I.'s father. The record is unclear

whether D.I.'s father is Knowlton or another man named Herman Guy. Knowlton's petition to remove D.I. from Mother's custody was subsequently dismissed.

The third petition to remove D.I. from Mother's custody was filed with the Shelby County Juvenile Court on February 21, 1995 by Mother's sister, Deneise Holmes. The third petition sought to remove both D.I. and Tameka, alleging that they were dependent and neglected. On April 19, 1995, the Juvenile Court found that D.I. and Tameka were dependent and neglected within the meaning of Tennessee Code Annotated § 37-1-102(b)(12) and placed them in foster care. Mother did not attend the hearing because, at the time, she was incarcerated for writing bad checks.

As of May 22, 1995, D.I. was first placed with a non-relative family friend, and the goal was to return D.I. to her Mother's care. By that time, D.I. had made several suicide attempts, as the result of an incident several years earlier in which she was raped by Mother's boyfriend. Under D.I.'s plan of care, Mother was to establish a regular visitation schedule, complete parenting classes, establish a safe and stabile home environment, obtain an alcohol and drug abuse assessment, and remain in contact with the Department of Children's Services ("DCS").[1]

On October 22, 1996, the Juvenile Court recommended that D.I. remain in foster care, and that DCS change its goal to adoption. On March 30, 1999, the Court Appointed Special Advocate ("CASA")[2] filed a petition to terminate the parental rights of Mother, Knowlton, Guy, and "any unknown father" in D.I.. The petition alleged that D.I. was the minor child of Mother, and the "legal child" of Herman Guy. It noted that no one was listed as D.I.'s father on her birth certificate, but stated that Knowlton had been named as D.I.'s "putative father." On June 2, 1999, the Juvenile Court entered an order terminating the parental rights of Guy, Knowlton, and "any unknown father" in D.I.. Their parental rights are not at issue in this appeal.

On August 2, 1999, Nekeisha filed a petition seeking to have D.I. removed from foster care and asking that she be granted custody of D.I.. This petition was denied.

A hearing on CASA's petition to terminate Mother's parental rights was held on November 18 and 29, 1999, by the Juvenile Court for Shelby County, with Special Judge George E. Blancett presiding. At the hearing, the DCS supervisor for D.I.'s case, Linda Williams, testified on behalf of CASA. She testified that DCS first received a referral in December 1991 indicating that D.I. had been sexually abused by Mother's boyfriend. The matter had been investigated, and Mother's

---

[1] In 1996, the Tennessee Department of Children's Services was established in an effort to consolidate the services provided to children by multiple state departments, including those provided by the Department of Human Services ("DHS"). *See* 1996 Tenn. Public Acts 1079, § 3. In this case, we refer to DCS, even though D.I.'s case was handled by DHS prior to 1996.

[2] The appellant in this case is CASA of Memphis and Shelby County, Inc., a Tennessee not-for-profit corporation authorized and appointed by the Shelby County Juvenile Court pursuant to Tennessee Code Annotated § 37-1-149(b)(1) to serve as an advocate for children who are alleged to be dependent and neglected within the meaning of Tennessee Code Annotated § 37-1-102(b)(12).

boyfriend was convicted and in jail. D.I. remained in Mother's home, and D.I. was referred to DCS for counseling. D.I.'s mental anguish over the abuse apparently resulted in her attempted suicide in February 1992 by overdosing on Tylenol. In March 1992, D.I. again attempted suicide by ingesting an elderly relative's medication. D.I. attempted suicide a third time, in June 1994, after seeing the abuser, Mother's former boyfriend, in her neighborhood. After this incident, DCS referred D.I. and Mother to the Memphis City Schools Mental Health Center for psychological counseling. Mother never followed through with the counseling.

In February 1995, DCS learned that D.I. was living with Otis Smith, her paternal step-uncle. In April 1995, Mr. Smith relinquished physical custody of D.I. back to Mother. DCS then lost track of D.I.'s whereabouts. D.I. was legally placed in DCS custody on April 19, 1995, and DCS tried to locate D.I. and Mother. D.I. was finally located at a local elementary school, where she had been enrolled by a friend of Mother's. DCS learned that Mother was incarcerated in Arkansas.

On June 16, 1995, DCS met with Mother while she was incarcerated in Arkansas to explain to her what she would need to do to regain custody of D.I. Under the plan of care, Mother needed to maintain written communication with D.I. while she was incarcerated and, once released, she was to attend and complete parenting classes, obtain a permanent home, obtain alcohol and drug abuse counseling, and maintain contact with DCS. The record is unclear as to when Mother was released from jail. In November 1995, however, she called DCS and asked for visitation with D.I. DCS told Mother that she could have only supervised visitation, because Mother had not obtained drug abuse treatment and had not obtained a permanent residence. Mother did not make a scheduled visit through DCS in 1995. However, she spent Thanksgiving with D.I. at her mother's home, and visited with D.I. at Mother's sister's home the following Sunday. Mother did not comply with any of the remaining conditions in the 1995 plan of care.

During 1996, Mother visited D.I. occasionally. However, some of the scheduled visits were canceled because Mother was again incarcerated. Until this time, D.I. had been placed with family members, but in March 1996, she was placed in the home of foster mother Geraldine Perkins. After D.I. was placed with Perkins, on several occasions Mother did not return D.I. at the designated time or to the designated place after her visits, sometimes keeping D.I. overnight without informing Perkins. Consequently, DCS told Mother that she could not have unsupervised visits with D.I.. While D.I. was living with Perkins, Mother called her on the telephone frequently, even though DCS had told Mother to direct her calls to DCS.

On November 19, 1996, a second plan of care was approved. The second plan had similar requirements to the first one, except instead of written communication with D.I., Mother was to maintain regular visitation with her. Mother completed parenting classes, but did not meet any other conditions under this plan of care. In September 1997, a third plan of care was approved. The third plan had the same requirements as the second one. DCS had no record of Mother visiting D.I. in 1997, but did have a record of D.I. visiting with one of her sisters. Mother told DCS that she had a permanent, stable home, but no verification of her address was obtained. The record has no indication that Mother complied with any of the remaining conditions under this third plan of care.

In September 1998, a fourth plan of care was approved. For a substantial period of time while this plan of care was in effect, Mother was incarcerated, and the record does not indicate any compliance with the fourth plan of care. In September 1999, a fifth plan of care was approved. Under this plan, Mother was required to maintain a permanent residence, obtain alcohol and drug abuse treatment, obtain employment, and enroll and participate in counseling to address the issues surrounding D.I.'s sexual abuse and issues from her own past. Under the fifth plan, in September 1999, Mother obtained employment. During 1999, Mother visited D.I. several times, and bought her gifts, clothing, and school supplies. DCS had no indication that Mother fulfilled any of the other requirements of the plan of care.

Williams testified that D.I.'s sisters, Nekeisha and Tameka, had contacted DCS several times while D.I. was in foster care, and that they asked to visit with her. Nekeisha asked DCS about D.I. coming to live with her, and filed a petition seeking custody of D.I.

Geraldine Perkins testified that Mother called D.I. sporadically, sometimes calling two or three times in a short period of time and then not calling for months at a time. Perkins said that D.I. often became frustrated when Mother made promises to her that she did not keep. As a result, Perkins said, D.I. had a "split personality." D.I. was an honor roll student, active in school activities and a majorette, but when her Mother disappointed her, D.I. would act out, harming herself or others. Perkins testified that Mother never paid support for D.I. and she rarely gave her gifts for her birthday or other holidays. Despite this, Perkins testified, D.I. loved Mother and wanted to continue a relationship with her.

Beth Hand, a licensed clinical social worker with the Memphis City School system, testified on behalf of CASA. Hand testified that DCS referred D.I. to her in 1995, and that she helped D.I. address issues regarding her sexual abuse, maternal abandonment, and adjustment to her foster home. Hand testified that Mother was invited to participate in the counseling with D.I., but never did. Hand testified that D.I.'s problems regarding Mother resulted in her bedwetting, and that these problems became worse when Mother was in close contact with D.I.. She acknowledged that D.I.'s anxiety stemmed from the lack of time that Mother spent with her. Hand said that D.I. loved her Mother and wanted more phone contact and more visits with her. Hand was asked how D.I. felt when she could not talk to Mother. Hand said:

> Yes. [D.I.] would feel sad. Her mom – according to [D.I.], her mom made promises to her to call, to visit, to bring her a gift, to whatever, and then it wouldn't happen. So [D.I.] would start feeling sad and worried and wondering what's happened with her mom. And she might talk to her sister sometimes and her sister would reassure her that mom was okay. And then she would start feeling angry that her mom hadn't called or hadn't been in touch with her. And then her mom would call, and then we would start this cycle all over again.

On December 2, 1999, the hearing resumed. The petitioner closed its proof and Judge Blancett said it was "time to hear the response on behalf of the mother. . . ." At this point, Judge Blancett *sua sponte* dismissed CASA's petition to terminate Mother's parental rights, without hearing proof from Mother. In remarks from the bench, Judge Blancett acknowledged that there was evidence that Mother did not fulfill her requirements under DCS's plans of care and that she did not support D.I.. However, he observed that when a child has reached the age of twelve, and there is evidence of a strong bond between the child and the natural parent, "there's a possibility of more detriment that could break that relationship or child . . . and it may be incumbent upon those charged with that responsibility to work towards that goal of reunification of the family as opposed to . . . terminating parental rights." Judge Blancett found that termination of Mother's parental rights was not in D.I.'s best interest, and ordered that D.I. remain in the custody of DCS "under a strict regimen for reunification [of] the child . . . with the parents and the siblings in the most opportune and expedited time." He entered an order dismissing CASA's petition. From this order, CASA now appeals.

On January 25, 2001, Mother filed with this Court a motion to a consider post-judgment fact, namely, that D.I.'s foster mother, Geraldine Perkins, died in December 2000. On March 23, 2001, the record on appeal was supplemented to include this fact.

On appeal, CASA raises two issues. CASA argues first that the juvenile court erred by dismissing its petition to terminate Mother's parental rights when there was clear and convincing evidence that Mother willfully failed to visit D.I., provide for her support, or provide sexual abuse counseling for her during the four years in which D.I. was in DCS custody. CASA also argues that the juvenile court erred by dismissing its petition *sua sponte* without permitting CASA to cross examine Mother.

We address first CASA's argument that the juvenile court precluded it from cross-examining Mother by dismissing CASA's petition at the conclusion of CASA's proof. CASA apparently anticipated that Mother would testify on her own behalf and that CASA would have the opportunity to cross-examine her during Mother's proof. However, the juvenile court waited to rule until CASA concluded its proof. CASA could have called Mother as a witness during its case in chief, but chose not to do so. This argument is without merit.

We next consider CASA's argument that the juvenile court erred in dismissing its petition because the evidence proved the statutory grounds to support the termination of Mother's parental rights. Parents have a fundamental right in the care, custody, and control of their children. *See Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is not absolute, however, and may be terminated in certain limited circumstances. *See In re Swanson*, 2 S.W.3d 180, 187-88 (Tenn. 1999).

In Tennessee, the termination of parental rights must be based upon (1) a finding by clear and convincing evidence that one or more of the statutory grounds for termination of parental rights have been established, and (2) a finding that the termination of the parent's rights is in the best interest

of the child. *See* Tenn. Code Ann. § 36-1-113(c) (Supp. 2000). *See also In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Therefore, even where there is clear and convincing evidence that one or more of the statutory grounds listed in Tennessee Code Annotated § 36-1-113(g) exists, the petitioner, CASA, must also establish that the termination of parental rights would be in the child's best interest. In this case, the juvenile court's dismissal of CASA's petition was clearly premised on its finding that termination of Mother's parental rights was not in D.I.'s best interest. Judge Blancett stated that even though there was evidence of abandonment and evidence that Mother had failed to fulfill the requirements of the plans of care, he did not find that the termination of Mother's parental rights was in D.I.'s best interest.

CASA rightly notes that there is abundant evidence of statutory grounds for terminating Mother's parental rights. Had the trial court found that termination of Mother's parental rights was in D.I.'s best interest, there was evidence to support such a finding. However, the trial court listened to the testimony of CASA's witnesses, the DCS supervisor, Linda Williams, D.I.'s foster mother Geraldine Perkins, and the school social worker who counseled D.I., Beth Hand. From the testimony of all of these witnesses, it is clear that D.I.'s relationship with Mother is a deeply troubled one, and the source of great anguish for D.I. D.I.'s heartache over her mother appears to stem from her love for Mother and her desire for a better relationship with Mother, juxtaposed against the inevitable disillusionment when Mother again fails her. The trial judge considered this testimony, considered D.I.'s age, 13 years old, and considered as well her relationship with her grown sisters, one of whom has sought custody of D.I. Unfortunately, this is the type of situation for which the legal system has no good solution. Under these circumstances, we cannot find that the juvenile court erred in concluding that termination of Mother's parental rights was not in D.I.'s best interest, and consequently in dismissing CASA's petition to terminate Mother's parental rights.

The decision of the trial court is affirmed. Costs shall be taxed to the Appellant, Court Appointed Special Advocate, and its surety, for which execution may issue if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE